UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUARANTEED RATE, INC.,<br><br>        Claimant,<br><br>v.<br><br>RICHARD M. FAUST,<br><br>        Respondent. | Case No.: 3:24-cv-00434-W-DEB<br><br>**ORDER GRANTING CLAIMANT'S PETITION FOR ORDER COMPELLING ARBITRATION [DOC. 1]** |

Pending before the Court is Claimant Guaranteed Rate, Inc.'s ("GRI") petition seeking an Order Compelling Respondent Richard M. Foust to arbitration for the above-entitled action. ([Doc. 1], *Pet. for Order Compelling Arbitration* ("*Pet.*").) The Court decides the matter on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d)(1). For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** GRI's Petition [Doc. 1].

1

## I. BACKGROUND

On February 8, 2022, Respondent Richard Faust executed three agreements with Claimant GRI. (*Pet.* at ¶¶ 7–8.) They each signed and acknowledged the "Compensation, Corporate Objective, and Loan Pricing Schedule" ([Doc. 1-6], at 18–36 "Schedule"), the "Retail Sales Compensation Plan and Agreement" ([Doc. 1-5], at 2–13 "Plan"), and the "Voluntary Mutual Agreement to Arbitrate Claims" ([Doc. 1-5], at 14–17 "Arbitration Agreement").

First, the Schedule listed the criteria and calculations for earning commissions at GRI, and it set forth the consequences for Mr. Faust if he resigned or otherwise separated from GRI before completing two years of employment. (*Schedule* at § 4; *see* [Doc. 7], at 4:12–15 "Reply".) The Schedule also contained a detailed description of the "Sign On Bonus" that Mr. Faust would receive once he satisfied certain eligibility criteria. (*Reply* at 4:15–17.) Under the Schedule's terms, GRI agreed to advance Mr. Faust the Sign On Bonus of $1,400,000 in two installments: $700,000.00 on his first eligible payroll date after licensure and $700,000.00 on his fourth eligible payroll date after licensure, subject to certain terms and conditions. (*Schedule* at § 4; *see Pet.* at ¶ 14.) Mr. Faust acknowledged that this Sign On Bonus would be subject to full repayment unless and until he was continuously employed by GRI for two years, starting from February 8, 2022. (*Schedule* at § 4; *see Pet.* at ¶ 15.) He agreed to make such repayment to GRI within ten days of the last day of his employment. (*Schedule* at § 4; *see Pet.* at ¶ 16.)

Second, the Plan referenced the Schedule and the Arbitration Agreement, stating that "[a]ny disputes relating to this Schedule and the Compensation Terms are subject to the terms of the mutual arbitration agreement between [Mr. Faust] and [GRI], whether set forth in the Employment Terms, Compensation Terms or a separate arbitration agreement which requires [Mr. Faust] to resolve disputes with [GRI] on an individual basis through final and binding arbitration." (*Plan* at § VII.)

Third, the Arbitration Agreement again established that the parties agreed to "utilize binding arbitration as the sole and exclusive means to resolve *all claims* (legal or

equitable), disputes or controversies *arising out of*, *relating to*, *or resulting from* [Mr. Faust's] *employment* with the Company." (*Arbitration Agreement* at § 2 [emphasis added].) It then expanded the scope of arbitrable issues by stating that "[e]xcept as provided below, both of the Parties agree that any claim, dispute, or controversy [Mr. Faust] may have against [GRI], or [GRI] may have against [Mr. Faust] will be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act." (*Id.*) The Arbitration Agreement also allowed the arbitrator to "award reasonable fees and costs or any portion thereof to the prevailing party to the same extent a court would be entitled to do so, in accordance with applicable law." (*Arbitration Agreement* at § 13.)

On February 28, 2022, Mr. Faust executed a Promissory Note with GRI. ([Doc. 1-6], at 43–46 "Note"; *see Pet.* at ¶ 17.) The Note listed much of the same terms as those in the Schedule, but it did not specifically contain an arbitration provision and had an integration clause, stating "[t]his Note sets forth all of the terms and conditions of the agreement between Payee and Borrower *concerning the subject matter hereof* and any prior oral communications are superseded by this Note." (*Note* at § 18 [emphasis added].)

In the Note, Mr. Faust continued to acknowledge that the Sign On Bonus (referred to in the Note as the "Principal Amount") was an advance received "before such money was earned" and that it is subject to repayment "except as specifically set forth below." (*Note* at §§ 1–2.) To avoid repayment, Mr. Faust was required to maintain "continuous employment" with GRI for two years. (*Id.*) However, the Note modified the start date of this two-year period from February 8, 2022, until March 11, 2022. (*Id.* at § 1.) It also added that GRI agreed to "forgive one eighth (1/8) of the Principal Amount for each full quarter of employment [Respondent] ha[s] completed with [GRI] following the effective date." (*Id.* at § 2.) Mr. Faust here agreed to repay the unforgiven portions of the Sign On Bonus, along with any interest, if he otherwise terminated his employment early. (*Id.* at §§ 1, 6–7, 9.) And he promised to do so within ten days after his last day of employment with GRI. (*Id.* at § 1.)

If Mr. Faust defaulted by failing to repay any unforgiven portion, the Note required him to pay interest "at a rate of 9% per annum from the date of default, or, if such rate of interest may not be collected under applicable law, then at the maximum rate of interest which may be collected from Borrower under applicable law." (*Note* at § 7.) Mr. Faust also agreed to reimburse GRI "all costs of collection and enforcement, including reasonable attorney's fees and court costs in addition to other amounts due." (*Id.* at § 12.)

On March 10, 2022, Mr. Faust and GRI executed an addendum ("Addendum 1") to the Plan. ([Doc. 1-6], at 48-49.) In which, Mr. Faust agreed to "be responsible for the full cost of [his] Sales Assistant's salary and bonuses," with GRI paying his Sales Assistant through its payroll and reducing Mr. Faust's compensation accordingly. (*Id.* at § 2.)

Mr. Faust began working as GRI's Vice President of Mortgage Lending the next day. (*Pet.* at ¶ 6.) GRI paid Mr. Faust the two installments of the Sign On Bonus on or about March 31, 2022, and May 13, 2022. (*Id.* at ¶¶ 23–24.)

On September 30, 2022, Mr. Faust and GRI executed another addendum to the Plan. ([Doc. 1-6], at 51–52.) Mr. Faust agreed to pay for his Associate Vice President's non-recoverable draw if the Associate Vice President's commissions fell below the prevailing minimum wage in any pay period. (*Id.* at § 3.) Mr. Faust "expressly authorize[d] [GRI] to deduct from [his] commission to cover" this cost. (*Id.*)

On July 27, 2023, Mr. Faust resigned after five full quarters of employment with GRI. (*Pet.* at ¶ 25.) Pursuant to the Plan and the Note, GRI contends that Mr. Faust only earned $875,000.00 of the Sign On Bonus and must repay $525,000.00. (*Id.* at ¶ 26.) GRI also alleges damages under the two addendums: (1) $5,898.69 for the amount it paid Mr. Faust's Sales Assistant pursuant to Addendum 1, and (2) $2,813.98 for the amount it paid Mr. Faust's Associate Vice President pursuant to Addendum 8. (*Id.* at ¶¶ 32–39.)

GRI attempted to initiate arbitration with Judicate West, but Mr. Faust chose not to retain counsel for the arbitration proceedings. ([Doc. 1-2], at ¶ 3 "*O'Connor Decl.*")

Judicate West then required GRI to obtain a court order compelling Mr. Faust to participate in arbitration. (*Id.*) A few months later, GRI filed this petition seeking to compel arbitration and obtain attorneys' fees and costs. (*Pet.* at 8:19–24.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

"A party seeking to compel arbitration has the burden under the FAA to show (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). "The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

When ruling on a petition seeking to compel arbitration, the court applies "'ordinary state-law principles that govern the formation of contracts' to decide whether an agreement to arbitrate exists." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (citation omitted). California law requires contracts to have (1) "[p]arties capable of contracting"; (2) "[t]heir consent"; (3) "[a] lawful object"; and (4) "[a] sufficient cause or consideration." Cal. Civ. Code § 1550 (West 2024). However, "[i]n keeping with California's strong public policy in favor of arbitration, any

doubts regarding the validity of an arbitration agreement are resolved in favor of arbitration." *Samaniego v. Empire Today, LLC*, 205 Cal. App. 4th 1138, 1144 (2012).

### III.  DISCUSSION

There is no dispute that Respondent Mr. Faust signed the various agreements that Claimant GRI presented.  (*See Reply* at 2:9–15.)  GRI has therefore met its initial burden of proof that the contracts exist by attaching "cop[ies] of the purported arbitration agreement[s] bearing [Mr. Faust's] signature." *Espejo v. S. Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047, 1060 (2016).  The only remaining issue for compelling arbitration is whether the parties consented to an arbitration agreement for this dispute.

Mr. Faust asserts that arbitration should not be compelled because the dispute arises from the Note, which does not contain an arbitration provision.  ([Doc. 5], "*Opp'n*" at 2:19–20.)  However, Mr. Faust's arguments are unconvincing for several reasons.

First, the Arbitration Agreement explicitly states that Mr. Faust agrees to arbitrate "*all claims . . . arising out of, relating to, or resulting from* [his] *employment* [with GRI]" and that "*any claim, dispute, or controversy* [Mr. Faust] may have against [GRI], or [GRI] may have against [Mr. Faust] will be submitted to and determined exclusively by binding arbitration." (*Arbitration Agreement* at § 2 [emphasis added]).  And nothing in the Note disclaims this agreement to arbitrate.  To the contrary, the money at issue in the Note was the $1,400,000 Sign On Bonus created in the Schedule, which in turn specifically stated that "[a]ny disputes relating to this Schedule and the Compensation Terms are subject to the terms of the mutual arbitration agreement between You [Mr. Faust] and the Company [GRI], whether set forth in the Employment Terms, Compensation Terms[,] or a separate arbitration agreement which requires You [Mr. Faust] to resolve disputes with the Company [GRI] on an individual basis through final and binding arbitration." (*Plan* at § VII.)

Second, the Note's provision stating that it is governed by California law does not exclude the prospect of arbitration.  Indeed, the Arbitration Agreement itself specifically

states that the "law of California will apply" to the "arbitration" proceedings. (*Arbitration Agreement* at § 16.)

Third, the Note's references to "suits brought for collection," "other judicial proceeding[s]," and "court costs" do not abrogate the prior arbitration agreements. (*See Note* at § 12.) In *Fuentes v. Empire Nissan, Inc.*, the court upheld an arbitration agreement even though a later agreement specified review by "any *court* of competent jurisdiction" and the parties' "consent[ed] to judicial modification" of overly broad terms. 90 Cal. App. 5th 919, 932 (2023) (holding that "[i]n light of [California]'s strong policy favoring arbitration, the reasonable interpretation of [these terms] preserves mutuality and arbitration."). The *Fuentes* court recognized that a reasonable interpretation of "judicial" includes the actions of arbitrators, who do "'judicial' work in an arbitration setting." *Id.* Similarly, the Note's reference to "judicial proceeding[s]" cannot be reasonably interpreted as to invalidate the applicability of the Arbitration Agreement.

Fourth, the Note's integration clause does not exclude the past arbitration agreements. (*Note* at § 18.) In *Jenks v. DLA Piper Rudnick Gray Cary U.S. LLP*, the court held that an integration clause explicitly limited to "the subject matter hereof" did not terminate a prior arbitration provision. 243 Cal. App. 4th 1, 15 (2015) (ruling that a contract with an integration clause but with no arbitration provision did not abrogate a prior arbitration agreement because the "subject matter" of the later agreement did not involve dispute resolution); *see also Oxford Preparatory Acad. v. Edlighten Learning Sols.*, 34 Cal. App. 5th 605, 612 (2019) (holding that "a superseding agreement silent on dispute resolution" did not overrule an arbitration clause in an earlier contract). Here, the Note's integration clause is also limited to "the subject matter hereof," and it is silent on dispute resolution. (*Note* at § 18.) Arbitration is not part of the "subject matter" referenced by the integration clause, which instead relates only to the terms of the Sign On Bonus. *See Jenks*, 243 Cal. App. 4th at 15. The integration clause therefore does not exclude the dispute resolution process set forth in the prior arbitration agreements. Any

disputes arising from the Note must be subject to arbitration, and the Court grants GRI's petition compelling arbitration.

In its Petition, GRI also seeks an award of "'attorneys' fees and costs." (*Pet.* at 8:19–24.) The Plan states that GRI "may recover from [Mr. Faust] its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement," and the Note contains a similar provision as well. (*Plan* at § IX; *Note* at § 12.) However, the Arbitration Agreement also states that "[t]he arbitrator may award reasonable fees and costs or any portion thereof to the prevailing party to the same extent a court would be entitled to do so." (*Arbitration Agreement* at § 13.) Whether GRI is the "prevailing party" and is successful in "enforc[ing]" its agreements remain to be seen and are left to the arbitrator. Pursuant to its agreements, GRI must enforce its claims in arbitration and should seek attorneys' fees and costs from the arbitrator. The Court denies GRI's petition for attorneys' fees and costs.

### IV. CONCLUSION AND ORDER

For the foregoing reasons, Claimant GRI's Petition for Order Compelling Arbitration [Doc. 1] is **GRANTED IN PART** and **DENIED IN PART**. Respondent Richard M. Faust must submit to arbitration for claims against him arising out of his employment with GRI. GRI is not entitled to attorneys' fees and costs from this Court, and it must seek such relief from the arbitrator.

**IT IS SO ORDERED.**

Dated: September 19, 2024

_____
Hon. Thomas J. Whelan
United States District Judge